**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SERILYN KRASH,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:16-0093** |
| **v.** | : | |
| | | **(JUDGE MANNION)** |
| **RELIANCE STANDARD LIFE** | : | |
| **INSURANCE COMPANY,**[1] | | |
| | : | |
| **Defendant** | | |
| | : | |

## MEMORANDUM

Pending before the court are the parties' cross-motions for summary judgment. (Doc.14, Doc. 17). Based upon the court's review of the motions and related materials, the plaintiff's motion for summary judgment will be denied and the defendant's motion for summary judgment will be granted.

By way of relevant background, on December 22, 2015, the plaintiff filed this Employee Retirement Income Security Act, ("ERISA"), 29 U.S.C. §1001, et seq., action in the Court of Common Pleas of Lackawanna County challenging the defendant's termination of her disability benefits. On January 19, 2016, the action was removed to this court. (Doc. 1). On May 19, 2016,

---

[1]In their case management plan, the parties agree that the name of the defendant should be amended to "Reliance Standard Life Insurance Company", as it was improperly identified as "Reliance Standard Life Insurance Group" in the complaint. (Doc. 7, p. 7).

the plaintiff filed her motion for summary judgment, (Doc. 14), along with a supporting brief, (Doc. 15), and statement of material facts, (Doc. 16). The defendant filed a response to the plaintiff's statement of material facts on June 10, 2016, (Doc. 20), along with a brief in opposition to the plaintiff's motion for summary judgment, (Doc. 21).

In the meantime, on May 20, 2016, the defendant filed its own motion for summary judgment, (Doc. 17), along with a statement of material facts with supporting exhibits, (Doc. 18), and a supporting brief, (Doc. 19). The plaintiff has neither responded to the defendant's statement of material facts, nor filed a brief opposing the defendant's motion for summary judgment.

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's

function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant]

3

will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

The summary judgment standard does not change when the parties have filed cross-motions for summary judgment. Applemans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987). When confronted with cross-motions for summary judgment, as in this case, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." Marciniak v. Prudential Financial Ins. Co. of America, 2006 WL 1697010, at *3 (3d Cir. June 21, 2006) (citations omitted) (not precedential). If review of cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts. Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted). See Nationwide Mut. Ins. Co. v. Roth, 2006 WL 3069721, at *3 (M.D. Pa. Oct. 26, 2006) *aff'd*, 252 F. App'x 505 (3d Cir. 2007).

Section 1132(a)(1)(B) of ERISA provides the plaintiff a right of action "to recover benefits due to [her] under the terms of [her] plan." 29 U.S.C. §1132(a)(1)(B). To prevail on a claim under §1132(a)(1)(B), the plaintiff must

demonstrate that she has "a right to benefits that is legally enforceable against the plan, and that the plan administrator improperly denied those benefits." <u>Fleisher v. Standard Ins. Co.</u>, 679 F.3d 116, 120 (3d Cir. 2012) (internal quotations omitted).

The Supreme Court has instructed that courts are to review the denial of benefits challenged under §1132(a)(1)(B) "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). When a plan grants its administrator the discretion to determine eligibility or to construe the plan terms, "we review a denial of benefits under an 'arbitrary and capricious' standard.'" <u>Orvosh v. Program of Grp. Ins. for Salaried Employees of Volkswagen of Am., Inc.</u>, 222 F.3d 123, 129 (3d Cir. 2000). The parties in this case agree that Reliance Standard Life Insurance Company, ("Reliance"), has discretion to interpret the terms of the policy and to make eligibility determinations and, therefore, the "arbitrary and capricious" standard is the correct standard of review in this case. "An administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" <u>Miller v. Am. Airlines, Inc.</u>, 632 F.3d 837, 845 (3d Cir. 2011) (quoting <u>Abnathya v. Hoffmann-La Roche, Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993)) (internal quotation marks omitted). The Third

Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Fleisher, 679 F.3d at 121.

Under the arbitrary and capricious standard, the "scope of review is narrow and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" Abnathya, 2 F.3d at 45 (quoting Lucash v. Strick Corp., 602 F.Supp. 430, 434 (E.D. Pa. 1984)). Therefore, the court is limited to considering only the evidence that was before Reliance at the time it reviewed and decided the claim. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997).

Reliance provides that there is a structural conflict of interest that exists because Reliance both pays benefits due and makes eligibility determinations. The standard of review does not change where a structural conflict of interest exists, namely when an insurance company both funds and administers benefits. Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008); Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009). "Instead, courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. §1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its

discretion." Id.

The undisputed facts of record in this case[2] demonstrate that Reliance issued the group long term disability policy under which the plaintiff is seeking benefits to Immune Deficiency Foundation, ("IDF"), where the plaintiff was employed as a Patient Advocate. The plaintiff's occupation is classified as a light exertion level occupation. In accordance with the policy, before any benefits are paid, a claimant must satisfy a 90-day elimination period, during which time they must be continuously unable to perform the material duties of their regular occupation. After the elimination period, benefits are payable for up to 24 months, as long as the claimant remains disabled from their regular occupation. After 24 months, benefits are only payable if an insured cannot perform the material duties of *any* occupation.[3] (Emphasis added).

---

[2]Contrary to L.R. 56.1, the plaintiff has not responded to the defendant's statement of material facts. Those facts are, therefore, deemed admitted and are supplemented by the undisputed facts provided in the plaintiff's statement of material facts to which the defendant has responded.

[3]Under the policy, "Disabled" and "Total Disability" mean, that as a result of injury or sickness:

(1)    during the elimination period and for the first 24 months for which a monthly benefit is payable, an insured cannot perform the material duties of his/her regular occupation.

(a)    "Partially Disabled" and "Partial Disability" mean that as a result of an injury or sickness an insured is
(continued...)

The policy also contains a 24-month aggregate lifetime limit on benefits for any disability that is caused by or contributed to by a mental or nervous disorder, including depressive and anxiety disorders.

On May 13, 2010, the plaintiff stopped working due to back pain. In relation to this, the plaintiff reported having previously undergone a vertebrae fusion in 1990 while in high school. On April 25, 2008, the plaintiff underwent a posterior spinal fusion L3 to the sacrum with instrumentation from L3 to S1. She had a transdiscal screw inserted from S1-L5, a posterior spinal fusion of L3-L4, a L3-L4 laminectomy, a L3-L4 posterior spinal osteotomy, and a local bone graft. A lumbar x-ray dated February 23, 2009, lists the plaintiff as having a Grade 2 Anterior Spondylolisthesis at L5-S1, as does a lumbar x-ray

---

[3](...continued)
        capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full time basis. An insured who is Partially Disabled will be considered Totally Disabled, except during the elimination period;

    (b)    "Residual Disability" means being partially disabled during the elimination period. Residual disability will be considered total disability; and

   (2)    after a monthly benefit has been paid for 24 months, an insured cannot perform the material duties of any occupation. We consider the insured totally disabled if due to an injury or sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis.

dated July 2, 2009. A disability claim statement from Christopher J. Dewald, M.D., the plaintiff's orthopedic surgeon, attributed the plaintiff's back pain to spondylolisthesis, lumbar stenosis and lumbago.

Reliance, which also insures IDF's short term disability plan, approved the plaintiff's claim from short term disability benefits. After the plaintiff's short term disability benefits were exhausted, Reliance approved the plaintiff's long term disability claim and benefits began on August 15, 2010.

After approving the plaintiff's long term disability claim, Reliance continued to obtain updated medical records. Those records demonstrate that, as early as May 27, 2010, the plaintiff treated for and frequently complained of anxiety and stress which contributed to her physical symptoms. In September 2010, the plaintiff received treatment for hives that were believed to be stress related.

During an October 4, 2010 vocational interview that was performed at Reliance's request, the plaintiff stated that she can lift no more than 15 pounds, and that she can stand, walk and sit for only 15 minutes at a time. On this, Reliance concluded that the plaintiff could perform sedentary level work activity but was not capable of performing the material duties of her regular, light level occupation. Therefore, the plaintiff's long term disability benefits was continued.

In November 2010, Eugene R. Stish, M.D., reported that the plaintiff

9

could not work due to back pain. He did not attribute any of the plaintiff's reported limitations to the effects of her medication. When asked whether the plaintiff was "capable of performing any work at any level of physical demand", Dr. Stish responded "no, she is having too much pain." However, on the same date, Dr. Stish completed a physical capacities questionnaire stating that the plaintiff is capable of occasional sitting, frequent standing and walking and sedentary lifting (i.e., up to 10 pounds of force occasionally, and/or a negligible amount of force frequently). Reliance again determined that the plaintiff was disabled from her own occupation and benefits continued.

On May 2, 2012, the plaintiff was evaluated by Shu Xu, M.D., a neurologist, who noted that the plaintiff's "[a]nxiety makes things worse." On May 16, 2012, and again on July 12, 2012, Dr. Xu noted that the plaintiff's tremors were "much better". In the meantime, a lumbar x-ray dated May 21, 2012 listed the plaintiff as having a Grade 3 Spondylolisthesis at L5-S1.

On July 24, 2012, Vagmin Vora, M.D., evaluated the plaintiff for her complaints of "[t]remor, status post spondylolisthesis surgery". In presenting the plaintiff's self-reported medical history, Dr. Vora noted that the plaintiff "underwent an L4-S1 fusion for high grade 4 spondylolisthesis . . . and was doing well after that." Dr. Vora's assessment and plan reflect "[a] 39-year-old female status post L3-S1 fusion for high grade 4 spondylolisthesis with persistent tremors since April of this year, left sacroiliitis and persistent low

back pain with minimal radicular complaint to the left lower extremity." Relative to her reported tremors, Dr. Vora indicated "[g]iven this patient's primary complaint of some tremors, we do not think these are coming from a spinal origin." Dr. Vora recommended that the plaintiff consult a neurologist regarding her tremor complaints. With respect to the plaintiff's back pain and radicular complaints, Dr. Vora noted that "these are stable and minor complaint[s] for her really compared to the tremors. We recommend that she continue with her conservative measures that she has been doing and to call us if she has any further problem of these. We will not schedule a routine follow up for this patient."

An MRI of the plaintiff's thoracic spine dated January 30, 2013 revealed "[n]o significant disc herniation, central canal or neuroforaminal stenosis." Further, an MRI of the plaintiff's lumbar spine dated the same day revealed "[n]o significant disk abnormality or spinal stenosis present. Laminectomy and pedicle screw fixation as described above. There has been no significant integral change."

A February 28, 2013 cervical MRI reflects a broad-based slightly left paracentral disc herniation with moderate impingement centrally upon the thecal sac at C4-5 and a broad based and slightly irregular disc osteophyte complex with moderate to severe impingement centrally upon the thecal sac and with mild bilateral neural foraminal impingement, slightly greater on the

left than the right at C5-6.

On March 14, 2013, the plaintiff treated with Dr. Stish at which time it was noted that the plaintiff exhibited no tremors during his examination. One month later, on April 11, 2013, Dr. Stish noted "Neurological: Motor exam reveals normal tone and strength. No involuntary movements noted on today's exam". Contrary to the statements in his treatment notes of March 14. 2013 and April 11, 2013, Dr. Stish prepared a letter to the Pennsylvania Insurance Department dated April 11, 2013, in which he stated that the plaintiff was not capable of working in any capacity because she was reportedly (a) unable to sit for more than 10 minutes, (b) unable to perform any job requiring the use of a computer or writing because of reported neck pain and (c) experiencing tremors that no physician was able to diagnose in the two years during which she complained of them.

On May 14, 2013, the plaintiff treated with Terence F. Duffy, M.D., who noted:

Objective:

\* \* \*

Physical examination shows patient [to] be in no acute distress. She appears much more relaxed. Palpable tenderness in the upper trapezius is noted. Minor restrictions to cervical range of motion. Tenderness persists across the lower lumbar region. I did not assess her lumbar flexion or extension for furosemide causing her lower body "movement disorder". Any upper extremities reflexes 1/4. Motor testing and sensation are normal.

At the request of Dr. Duffy, the plaintiff was evaluated by

Tsao-Wei Liang, M.D., Assistant Professor of Neurology, The

Parkinson's Disease & Movement Disorders Program at Jefferson

Hospital. In a subsequent letter to Dr. Duffy, Dr. Liang stated:

IMPRESSION and RECOMMENDATIONS:
My immediate suspicion based on the high variability and unusual
movements was that this was a psychogenic movement disorder.
* * *
I discussed my suspicion and the fact that many patients, who
have suffered from this condition including chronic pain, have
suffered a childhood trauma. Immediately, she became tearful
and described this history that her uncle had molested her in
childhood at the age of four.
* * *
Although this history is highly indicative of a potential psychogenic
etiology for movement disorder, it certainly is not always
diagnostic. At the same time, with discussion of this problem her
symptoms gradually improved and there was a sense of
understanding and relief when we discussed this, which is a good
prognostic factor. At this point, I would recommend gradually
reducing medical therapies if at all possible and I strongly
encouraged her to discuss with a counselor, clergyman, friend or
a psychologist the history and to potentially engage in formal
counseling and therapy regarding her prior history of abuse. I
have no further recommendations otherwise and suggest that she
follow-up as needed in the future.

On August 1, 2013, Dr. Stish noted that the plaintiff was "to see

psychologist" regarding her tremors.

The plaintiff was again evaluated by Dr. Xu on August 15, 2013, at

which time it was noted that no tremors were observed. Dr. Xu agreed that the

plaintiff "may benefit from counseling".

On September 3, 2013, Dr. Duffy referenced Dr. Liang's

13

correspondence and opinion that the plaintiff's "movement disorder is psychiatric".

Beginning on October 17, 2013, the plaintiff treated with Howard Ogin, M.A., a psychologist, who diagnosed her with posttraumatic stress disorder, conversion disorder and noted that she suffered from severe stress. Dr. Ogin identified the plaintiff's primary problem as unspecified chronic medical illnesses and her secondary problem as depression, anxiety and posttraumatic stress.

On November 13, 2013, Dr. Xu noted that the plaintiff "feels a little better with relaxation therapy. I have encouraged her to continue" and that the plaintiff was "Ok with decreased dose of Topamax. She may discontinue it in the future as the dose is very low." Dr. Xu encouraged the plaintiff to "stay active during the winter season".

A December 18, 2013, lumbar x-ray reflects:

FINDINGS: Plate and screws are present in the lower lumbar region. These have not changed in the interval since the prior study. There is a grade 2 spondylolisthesis at L5-S1, unchanged from the prior study. There is complete loss of disc height at L4-5 with disc space narrowing at L3-4. There is no fracture or compression deformity. Oblique files show no spondylolysis above the surgical level. The pedicles are preserved. The paravertebral soft tissues are unremarkable. There is no instability with flexion or extension. Limited movement is noted. There has been no change in the interval since the prior study.

Also on December 18, 2013, the plaintiff underwent another spine MRI.

14

Other than degenerative changes "[n]o instability [was] seen with flexion or extension".

In a letter to the Social Security Administration dated January 7, 2014, Dr. Duffy stated:

> Ms. Krash over the past 1.5 years has been on to develop a movement disorder involving her lower extremities. This has been treated with various medications including Klonopin and Topamax without much relief. She has recently been evaluated by a neurology movement disorder specialist at Thomas Jefferson University, Dr. Liang.

In this letter, Dr. Duffy further wrote that the plaintiff was totally and permanently disabled due to her chronic lumbar pain, bilateral lower extremity radicular pain, cervical pain with bilateral cervical radiculitis and lower extremity movement disorder. Dr. Duffy did not mention in his letter the findings of Dr. Liang, who indicated that the plaintiff's tremor complaints were psychogenic.

On February 11, 2014, the plaintiff treated with Dr. Duffy complaining of persistent posterior cervical pain, upper trapezius and periscapular pain associated with upper extremity radicular pain and increasing low back and lower extremity radicular pain. The plaintiff reported that her lower extremity fatigues at times. Upon examination, Dr. Duffy noted that the plaintiff's shoulders were rounded, with upper trapezius tender points extending into the periscapular regions bilaterally, with a limited range of motion. Examination

of the plaintiff's lumbar spine revealed tenderness in the midline at L5-S1 with paraspinal tenderness as well as tenderness extending into the gluteal areas bilaterally. The plaintiff's lumbar range of motion was limited and bilateral S1 tenderness was noted. The plaintiff had a positive result with the straight leg raising test. Dr. Duffy's impression was lumbar postlaminectomy syndrome, lower back pain, spasm of muscle, cervicalgia/neck pain, cervical stenosis and radiculitis and lumbar radiculitis.

On February 17, 2014, the plaintiff treated with Dr. Xu for tremors and back pain. Dr. Xu noted that the plaintiff appeared anxious and tense upon presentation. Upon examination, Dr. Xu noted no joint tenderness, muscle redness, contractures, muscle wasting, muscle fascirculation, or muscle hypertrophy. His neurological examination revealed normal memory, speech, sensation, deep tendon reflexes, muscle strength and tone, gait, fundi, eye movements, facial movements, Barbinski and Ankle clonus. Cranial nerves were intact. As to coordination, Dr. Xu noted "Reports: Finger-nose-finger, Reports: Tremor (FINE HAND TREMO) (sic). Dr. Xu's impression was tremor, anxiety, cervical disc disorder and chronic low back pain.

A cervical spine MRI conducted on February 27, 2014 showed degenerative disc disease most prominent at C4-C5 through C6-C7; Mild central spinal canal stenosis at C5-C6; and oval foraminal narrowing. Further noted was minimal linear T2 hyperintensity in the cord at C5 and especially

16

at C6. It was noted that this may reflect a small syrinx. Otherwise, findings appeared similar to her previous cervical MRI.

A thoracic spine MRI conducted the same day showed no central spinal canal stenosis or significant foraminal narrowing. Multiple small disc herniations were seen throughout the thoracic spine but did not appear to cause any foraminal narrowing or central canal stenosis. Otherwise, normal appearing thoracic spinal cord was noted.

Electromyogram, ("EMG") and nerve conduction velocity, ("NCV"), studies performed in March 2014 were noted to be normal.

The plaintiff treated with Dr. Xu on April 7, 2014, at which time his impression was again anxiety, cervical disc disorder, chronic low back pain and tremor.

Another cervical spine MRI conducted on April 15, 2014 noted a thin syrinx at the C6 level. No worsening of the plaintiff's condition was noted since her last study.

On May 14, 2014, the plaintiff treated with Dr. Daniel Gavio for back and neck pain. Upon examination, Dr. Gavio noted abnormal range of motion in her cervical region with cervical muscle spasms. The plaintiff tested positive to the Soto-Hall test. Her lumbar range of motion was noted to be abnormal and she was noted to have muscle spasm in that area as well. Positive findings were noted for to the bechterew, kemps, braggard and straight leg

tests. Dr. Gavio's diagnoses were lumbago and neck pain.

The plaintiff again treated with Dr. Gavio on May 21, 2014 for back and neck pain. Upon examination, Dr. Gavio noted findings similar to those on the plaintiff's prior exam. Dr. Gavio's diagnoses at this time were chronic low back pain and nonallopathic lesion of the cervical, thoracic and lumbar regions.

On June 4, 2014, the plaintiff treated with Dr. Gavio for back, neck and bilateral shoulder pain. Dr. Gavio's diagnoses were the same as for the plaintiff's previous visit with added neck pain.

On June 12, 2014, the plaintiff treated with Dr. Duffy, who noted upon examination that the plaintiff had bilateral trapezius tenderness, spasm and trigger point; bilateral cervical paraspinal spasm and trigger point and bilateral scalene tenderness, rhomboid tenderness, spasm and trigger point. Decreased flexion, extension and rotation were found as well as bilateral lumbar paraspinal tenderness, spasm and trigger point with bilateral gluteal region tenderness, spasm and trigger point. The plaintiff's lumbar spine had decreased flexion and extension on examination with a positive Patrick test bilaterally.

On June 18, 2014, June 25, 2014, July 2, 2014, and July 9, 2014, the plaintiff treated with Dr. Gavio for back, neck and bilateral shoulder pain. Dr. Gavio's findings on examination paralleled those of the plaintiff's prior examinations, as did his diagnoses.

18

On August 18, 2014, the plaintiff treated with Dr. Duffy. Upon examination, the plaintiff was noted to have 5/5 motor strength in all muscle groups and her Spurling's test was negative bilaterally. Dr. Duffy listed the plaintiff's diagnoses as "cervical pain; cervical disc herniation; spasm of muscle; syrinx of spinal cord and cervical dystonia".

Through a third party vendor, Reliance arranged for the plaintiff to undergo an independent medical examination with a Board Certified Orthopedic Surgeon. Arnold Berman, M.D., reviewed the plaintiff's medical records and examined her on September 18, 2014. Dr. Berman indicated that the plaintiff's diagnoses are degenerative disc disease of the lumbar spine, status post multiple lumbar spine fusions, and body tremors no organic basis. Dr. Berman concluded that the plaintiff is capable of performing sedentary work activity, in that she can sit, stand, walk, climb stairs and drive frequently; she can occasionally use foot controls; and cannot bend at her waist, squat, climb ladders, kneel or crawl. Dr. Berman found that there is evidence of "subjective complaints of pain without any clinical findings to substantiate these complaints. The records and findings on examination do not support any medical conditions currently impacting the claimant's status." Dr. Berman concluded that the plaintiff received appropriate treatment for her degenerative disc disease and that '[t]here was no indication in the available medical records that there was any organic basis for her complaints of

19

tremors and it was indicated by her primary care physicians, after review of Dr. Ling's (sic) neurology clinical note, that her tremors were psychogenic in nature." Dr. Berman further found that "there was no atrophy of the right or left upper or lower extremities, which indicates normal usage. Her grip and pinch testing demonstrated normal strength in the right and left. Finally, her handgrip manually was normal." Dr. Berman opined that the plaintiff would benefit from a psychiatric evaluation but found no clinical evidence to support her subjective disability claim.

After being asked to clarify his findings regarding the plaintiff's restrictions and limitations, and reviewing additional documentation, on October 29, 2014, Dr. Berman completed an addendum to his report, in which he maintained that the plaintiff was capable of sedentary work. In the addendum, Dr. Berman wrote that the plaintiff:

> . . . had normal clinical evaluation of her lumbar spine on 09/18/14 with only subjective complaints of mild pain on range of motion. There were no motor, reflex or sensory abnormalities noted as it relates orthopedically. She had 5/5 strength in both lower extremities, which would not prohibit her from standing or walking occasionally from a sitting position. It is my recommendation that she have frequent changes in position from sitting to standing and walking. There was no clinical evidence of spasm or radiculopathy noted on examination. It was noted during her examination that she could walk on her heels and toes with severe tremors. However, there was no indication in the available records that there was any organic basis for her complaints of tremors and it was indicated by her primary care physician, after review of Dr. Ling's (sic) neurology clinical note, that her tremors were psychogenic in nature.

20

On November 12, 2014, Dr. Berman completed a second addendum to his report to clarify his statement regarding the frequency with which the plaintiff needed to change positions. Dr. Berman again opined that the plaintiff "is capable of sedentary work," meaning "work [that] involves sitting most of the time, but may involve walking or standing for brief periods of time."

By letter dated November 20, 2014, Reliance discontinued the plaintiff's benefits on the basis that she suffered a mental or nervous condition that contributed to her alleged disability and that she was not, in the absence of a mental or nervous condition, physically disabled. In its letter, the defendant indicated that it asked Dr. Berman to clarify his opinion on two occasions, first regarding his opinion that the plaintiff was not impaired in light of his statement that she requires frequent breaks and, second to address additional records provided by the plaintiff. These resulted in the two addendums issued by Dr. Berman. The plaintiff appealed from the decision to discontinue her benefits, relying on her subjective complaints of pain and the opinions of some of her treating physicians that she was disabled.

As part of the review on appeal, again using a third party vendor, Reliance had the plaintiff's medical records reviewed by Sarah White, M.D., an independent Board Certified Physical Medicine and Rehabilitation Specialist. On May 11, 2015, Dr. White issued a report regarding her review of the plaintiff's medical records. Dr. White listed the plaintiff's medical

conditions as: neck pain, cervical disc herniations, multiple small thoracic herniations, low back pain, lumbar degenerative disc disease and L5-S1 Spondylolisthesis treated with lumbosacral L4-S1 fusion on 4-2-1990, and lumbosacral L3-S1 fusion on 4-25-2008. Secondary diagnoses included: psychogenic movement disorder, anemia, cardiac murmur, uterine bleeding, fibroids, cysts and benign right breast fibroadenoma.

Dr. White noted inconsistencies within the plaintiff's medical records both in the notes of a single physician and from treating physician to treating physician. Considering the medical records, as well as the plaintiff's subjective complaints, Dr. White concluded:

> In weighing the evidence, despite the inconsistencies, the medical documentation supports partial functional impairment based on the self-reported symptoms of neck pain and low back pain, the findings on physical examination of cervical lumbar tenderness, the abnormalities on the cervical, thoracic and lumbar spine imaging studies described above, and the diagnoses of neck pain, cervical disc herniations, multiple small thoracic disc herniations, low back pain, lumbar degenerative disc disease and L5-S1 spondylolisthesis treated with lumbosacral L4-S1 fusion on 4/2/90 and lumbosacral L3-S1 fusion on 4/25/08. Reasonable restrictions and limitations would include lifting, carrying, pushing, or pulling up to 10 pounds occasionally and a negligible amount of force from 12/15/14 and ongoing.

Dr. White further indicated:

> There are no restrictions and/or limitations for the right or left upper extremity with grasping, feeling, handling, manipulating, or fingering. There are no restrictions and/or limitations with regard to sitting. The claimant is restricted and/or limited to standing or walking for 1 hour continuously and 3 hours total per 8-hour day.

She should be allowed to change positions between sitting, standing, and walking as needed for comfort. The claimant does not have any reaching restrictions and/or limitations with the right or left upper extremity. Ms. Krash is able to perform fulltime activities throughout an 8-hour day with the above restrictions and limitations.

Dr. White further considered the medications that the plaintiff was prescribed and concluded that "[t]here is no evidence to support any side effects from the prescribed medications. In addition, there is no documentation in the medical record of side effects that would preclude the claimant from full-time work." Dr. White opined that the plaintiff's restrictions were permanent due to the chronic degenerative nature of her condition. She further indicated that she was unable to opine whether or not the plaintiff's secondary diagnoses contribute to the plaintiff's impairment, as they are outside of her area of expertise.

Apart from the plaintiff's treatment records, the record in this action demonstrates that the plaintiff filed two applications for Social Security disability benefits.[4] The first was shortly after she stopped working in May 2010. The plaintiff applied for Social Security disability benefits, alleging disability beginning May 17, 2010. Her claim was denied on March 3, 2011.

---

[4]The defendant concedes that the decisions of the Social Security Administration are not determinative of the plaintiff's disability claim under the Reliance policy, but argues that they are factors that weigh in favor of Reliance's decision to discontinue benefits.

The plaintiff's appeal of the decision denying her claim was denied on June 18, 2012, following a hearing before an Administrative Law Judge, ("ALJ"). In affirming the denial of the plaintiff's claim, the ALJ stated that the plaintiff's anxiety and depression, as diagnosed by her primary care physician, "do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non severe." The ALJ found that the plaintiff "has the following severe impairments: degenerative disc disease/degenerative joint disease of the cervical and lumbar spine, status post lumbar laminectomies and fusion" but that:

> The undersigned finds that the claimant's impairments, while severe, do not satisfy the requisite neurological, laboratory, clinical and/or diagnostic requirements for listing level severity. Thus, there are no medical findings that precisely meet or medically equal the criteria of any impairment described in the Listing of Impairments.

After considering the objective medical evidence, as well as the plaintiff's subjective complaints, the ALJ found that the plaintiff was not fully credible, stating:

> In terms of the claimant's complaints of pain, the objective evidence fails to support the severity of her symptoms and alleged limitations.
> * * *
> Upon a review of the evidence, the undersigned finds that the claimant's testimony with regard to her symptoms, not to be fully credible, because it was overstated, inconsistent with, and unsupported by, the great weight of the documentary medical evidence.

Although the ALJ concluded that the plaintiff was not capable of performing the duties of her prior occupation, she also concluded that the plaintiff is capable of sedentary level work activity and that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and was therefore "not disabled."

On August 1, 2012, the plaintiff filed her second application for Social Security disability benefits claiming an onset date of disability of June 19, 2012. The plaintiff's second claim was also denied. The plaintiff appealed and a hearing was held before another ALJ. The second ALJ determined:

> In making this determination concerning the plaintiff's impairments, the undersigned specifically reviewed section 1.04 (Disorders of the spine), and 11.00 (Neurological), et seq., of the listed impairments; and finds that the claimant's impairments, while severe, do not satisfy the requisite neurological, laboratory, clinical and/or diagnostic requirements for listing level severity.

The ALJ further determined:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The ALJ considered the plaintiff's mental status, which he also determined was not a basis for disability benefits. Ultimately, the ALJ determined that the

plaintiff was capable of performing light level work activity.

Considering the "any occupation test" for disability under the policy, Reliance investigated whether the plaintiff possessed skills that can be transferred to another occupation. The plaintiff is a college graduate who obtained a Masters in Health Administration in 1999 and had 13 years of consistent work history. On April 21, 2011, Reliance performed a Residual Employability Analysis to determine what, if any, alternative occupations the plaintiff would be capable of performing, considering her work history, education and training, as well as her sedentary physical limitations. Several alternative, sedentary occupations were identified, including: Vice President, Public Relations Representative, Contact Representative, Policyholder-Information Clerk and Program Manager. Based on the additional evidence provided on the plaintiff's appeal, Reliance performed a second Residual Employability Analysis, and the alternative occupations previously identified remained "viable alternatives" for the plaintiff.

By letter dated June 23, 2015, Reliance upheld the decision to discontinue the plaintiff's benefits, again finding that the plaintiff's claim was subject to the two-year limit on mental or nervous disorders and the plaintiff was not, even in the absence of a mental or nervous disorder, physically disabled. In so finding, the defendant considered the opinions of Dr. Berman and Dr. White, as well as "updated information from [the plaintiff] and her

treating physicians, including but not limited to records from Dr. Stish, Dr. Gavio, physiatrist Dr. Duffy, and neurologist Dr. Shu Xu". Based upon Reliance's review of all of the information in the records, Reliance determined that the plaintiff was capable of performing sedentary work activity and was therefore not disabled from "any" occupation.

The plaintiff, through counsel, then initiated the instant action in which she claims entitlement to benefits under the policy. In doing so, the plaintiff avers that her "condition is Spondylolisthesis Grade 4, which is a covered condition, as well as many others that are listed such as Regenerative (sic) Disc Disease." While Dr. Liang concluded that her spasms are psychogenic tremor disorder, the plaintiff alleges that she "clearly has a physical condition stemming back to 2007." The plaintiff alleges that she "does suffer from depression and anxiety, but to infer that her physical disability is Psychogenic is prosperous (sic)." The plaintiff alleges that she cannot perform the functions of her prior employment or any other employment as exhibited by Dr. Gavio's opinion on June 7, 2010 that she is totally disabled.

There is no dispute that the terms of the policy place the burden of proving a continuing disability on the plaintiff, as benefits are only payable after the plaintiff "submits satisfactory proof of Total Disability to [Reliance]." Based on information provided to Reliance, benefits were paid to the plaintiff through December 15, 2014. As of that date, however, the plaintiff was

27

required to prove to Reliance that she suffered from a condition which prevented her from performing the material duties, not only of her occupation, but of *any* occupation. (Emphasis added).

The defendant terminated the plaintiff's long term disability benefits for two reasons: (1) because the plaintiff suffers from a mental or nervous disorder that contributes to her alleged disability; and (2) even in the absence of a mental or nervous disorder, the plaintiff is not physically disabled from engaging in any occupation.

Initially, the defendant argues that it is clear from the record that the plaintiff has a mental or nervous disorder which contributes to her alleged disability. Under the policy, benefits are limited for a disability caused *or contributed to* by a mental or nervous disorder to 24 months. (Emphasis added). Mental disorders include depressive disorders and anxiety disorders. The record reflects that the plaintiff has been treated for both. In fact, on numerous occasions where it was noted that the plaintiff was treating for pain, it was also noted that the plaintiff was suffering from anxiety and/or depression. The only substantive argument the plaintiff raises in her motion for summary judgment relating to this basis for termination is that her mental diagnoses stem from and are secondary to her physical conditions and

therefore cannot act to preclude her benefits.[5] However, this limitation applies "even if the disabling mental conditions were precipitated by a physical injury. See Michaels v. Equitable Life Assur. Soc'y of the United States Emples., Managers, & Agents Long-Term Disability Plan, 305 Fed.Appx. 896, 908 (3d Cir. 2009). Any argument by the plaintiff that the limitation does not apply in her case because her mental impairments are caused by her physical impairments is without merit. Id. at 908 ("if a claimant is mentally disabled, the source of that mental condition does not affect the applicability of a plan's limitation on benefits").

In any event, the record does not support the plaintiff's claim that her mental impairments stem only from her physical conditions. Specifically, in July 2012, Dr. Vora, the plaintiff's orthopedic specialist, noted that the plaintiff's tremors were her primary complaint. He further indicated that the plaintiff's tremors were not spinal in nature. Both Dr. Vora and Dr. Duffy recommended that the plaintiff see a neurologist for her tremors. Dr. Xu, a neurologist, evaluated the plaintiff and indicated that her "[a]nxiety makes things worse." The plaintiff was referred to Dr. Liang, who opined that the plaintiff's tremors were related to a psychogenic movement disorder often

---

[5]As indicated, the plaintiff has not filed a brief in opposition to the defendant's motion for summary judgment, but only filed a brief in support of her own motion.

triggered by childhood trauma. When presented with Dr. Liang's opinion, the plaintiff professed that she had been molested by a relative as a child. Dr. Liang encouraged the plaintiff to discuss her situation with a counselor, clergyman, friend or psychologist. Dr. Stish, the plaintiff's primary care physician, noted that the plaintiff was "to see [a] psychologist". Dr. Xu also noted that the plaintiff "may benefit from counseling." The plaintiff ultimately saw Dr. Ogin, a psychologist, who indicated that the plaintiff suffered from posttraumatic stress disorder and conversion disorder with the traumatic event history noted as "sexual abuse". Thus, the record supports that the plaintiff's mental/nervous disorders, in part, stem from events in her childhood and not only from her physical condition.

Finally, as to her mental/nervous disorders, the plaintiff argues that neither Dr. Berman nor Dr. White, the independent medical providers, opined that she suffers from a mental disorder which is disabling in and of itself. However, the policy does not provide that the mental disorder has to be disabling in and of itself, but only that it has to contribute to an alleged disability. As discussed above, there is evidence that the plaintiff's mental/nervous disorders contribute to her condition. As such, this argument has no merit.

Because the record supports that the plaintiff suffers a contributing mental or nervous disorder, it was her burden to prove that she was totally

disabled from any occupation solely due to a physical condition. The plaintiff argues in her summary judgment motion that Reliance "abused its discretion in denying [her] Total Disability Benefits, especially when [her] main physical condition, spondylolisthesis grade 4, is a listed covered disorder entitling [her] to Total Disability Benefits per the Plan". Reliance does not dispute the plaintiff's diagnosis of spondylolisthesis or the fact that the plaintiff suffers from limitations as a result of her condition. Reliance argues, however, that the plaintiff's diagnosis of spondylolisthesis does not act as proof of disability. In fact, diagnosis alone is not proof of a disability. See Nichols v. Verizon Commc'ns, Inc., 78 Fed.Appx. 209, 212 (3d Cir. 2003). As such, the fact that the plaintiff has been diagnosed with a condition does not equate to proof that she is totally disabled from any occupation as a result of that condition.

The plaintiff also relies on the opinions of certain of her treating physicians, as well as her own subjective complaints to support her claim of total disability. However, neither is binding upon Reliance in its determination as to whether the plaintiff has proven totally disability. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician"); Magera v. Lincoln Nat'l Life Ins. Co., 2009 WL 3837265 (M.D.Pa., Nov. 16, 2009) (subjective complaints are insufficient to prove disability absent objective evidence of impairment).

As to her subjective complaints, in applying for disability benefits, the plaintiff claimed that she was unable to perform any work activity due to severe, disabling pain and spasms. She reported that she can lift no more than 15 pounds and that she can stand, walk and sit for only 15 minutes at a time. The plaintiff claimed that she "is incapable of regularly performing the functions of daily living, including daily grooming". The plaintiff reported that brushing her teeth "brings tears to her eyes" and that she "can't lift her arms without excruciating pain". She stated that she needs a break every 5 to 6 minutes when getting ready, and that she cannot dress herself normally or perform any household chores without pain. The plaintiff indicated that she cannot shop, except occasionally over the phone, and relies on others to do her shopping for her. According to the plaintiff, she cannot sit in front of a computer for any length of time.

The plaintiff argues that the opinion of Dr. Gavio, her chiropractor who supported her claim of disability, is dispositive of the issue. Dr. Gavio indicated that the plaintiff suffered from "debilitating muscle spasms" which prevented her from prolonged sitting, standing, or walking, and, as a result, prevented her from working. Reliance noted, however, that no physician pointed to any objective evidence of debilitating spasms, and Dr. Liang concluded that the plaintiff's spasms are psychogenic in nature. To the extent that Dr. Gavio found that the plaintiff's spasms were a physical disability,

Reliance found his opinion was not persuasive.

The plaintiff argues that the assessments by Dr. Xu in his February 17, 2014 and April 7, 2014 records of tremor, anxiety, cervical disc disorder and chronic low back pain support her claim of disability. Again, while the plaintiff was diagnosed with these conditions, diagnoses alone do not establish disability. Moreover, also in Dr. Xu's records on these dates are his findings upon examination, which indicate that the plaintiff had no joint tenderness, muscle redness, contractures, muscle wasting, muscle fascirculation or muscle hypertrophy. The plaintiff's muscle tone and strength were noted to be normal. Despite the plaintiff's claim that she is totally disabled and unable to perform even the basic functions of daily living, Dr. Xu "encourage[d] the plaintiff to stay active."

The plaintiff also cites to the records of Dr. Duffy dated June 12, 2014, which reflect that the plaintiff had tenderness, spasms and trigger points, in support of her claim of disability. However, in addition to these findings, Dr. Duffy noted that the plaintiff's range of motion in her shoulders, hips and knees was normal and that her muscle strength was 5/5 in all muscle groups. Testing for cervical nerve root compression was negative bilaterally. These findings were repeated on August 18, 2014.

The plaintiff also relies on the opinion of Dr. Stish in support of her claim of disability. Although Dr. Stish, the plaintiff's primary care physician,

33

supported her claim for total disability and reported that the plaintiff was in too much pain to perform any type of work, he also indicated that the plaintiff could sit occasionally (up to 33% of a workday); stand and walk, each frequently (34%-66% of a workday); and lift at a sedentary level. Dr. Stish further indicated that the plaintiff was capable of occasional bending, squatting, climbing, driving and using foot controls. According to Dr. Stish's functional assessment, the plaintiff could use both of her upper extremities to continuously perform simple grasping, fine manipulation and feeling/tactile sensation tasks; frequently reach above mid-chest level and reach at waist/desk level; and occasionally push/pull. Dr. Stish identified no other factors which would affect the plaintiff's abilities.

The objective findings of Dr. Gavio, Dr. Xu, Dr. Duffy and Dr. Stish upon examination of the plaintiff do not support her claim of total disability. The plaintiff claims that she is prevented from doing virtually any physical activity due to her condition, even the most basic functions of daily living such as brushing her teeth or getting dressed. However, the findings of her own doctors reflect that the plaintiff had good motor strength, no muscle wasting, muscle fascirculation or muscle hypertrophy, and normal muscle tone and strength. These are not findings one would expect to find if physical activity were totally restricted.

In addition to the records of the above physicians, Reliance cites to the

records of Dr. Vora, another of the plaintiff's treating physicians, who evaluated the plaintiff in July 2012 for "tremor, status post spondylolisthesis surgery" and indicated that the plaintiff's tremors, and not her back pain, was her primary complaint. Dr. Vora noted that the plaintiff's back pain and radicular complaints were "stable and minor complaint[s] for her really compared to the tremors." This assessment provides further evidence in support of Reliance's determination that the plaintiff was not totally disabled based upon her spondylolisthesis and back pain.

In addition to the findings of the plaintiff's treating physicians, Reliance considered the findings of Dr. Berman, a Board Certified Orthopedic Surgeon, and Dr. White, a Board Certified Physical Medicine and Rehabilitation Specialist, two independent medical providers, appointed by a neutral third party, to evaluate the plaintiff and determine whether she is totally disabled from work in any occupation.[6] Despite the plaintiff's claim that the report Dr. Berman is "vague, sparse and ignored objective medical evidence", a review of the record demonstrates that Dr. Berman issued a 30-page report outlining the records he reviewed and summarizing the plaintiff's medical history. Dr. Berman included his findings upon examination of the plaintiff. In light of all

---

[6]While the plaintiff argues in her motion for summary judgment that the defendant gave conclusive weight to the reports of these physicians, the record demonstrates that their reports were considered in conjunction with the records of the plaintiff's treating physicians.

of the medical evidence of record, as well as his own examination of the plaintiff, Dr. Berman diagnosed the plaintiff with degenerative disc disease of the lumbar spine, status post multiple lumbar spine fusions and body tremors with no organic basis. He found, however, that the plaintiff's subjective complaints were not supported by any clinical findings from his examination or the medical records. Dr. Berman noted that "there was no atrophy of the right or left upper extremities, which indicates normal usage". Further, the plaintiff's "grip and pinch testing demonstrated normal strength on the right and left. Finally, the plaintiff's handgrip was manually normal." The plaintiff had "no motor, reflex or sensory abnormalities noted as it relates orthopedically." Her strength was 5/5 . . . in both lower extremities, which would not prohibit her from standing or walking occasionally from a sitting position." The plaintiff's prognosis was found to be good. Dr. Berman opined that the plaintiff was capable of performing sedentary work provided that she is afforded to change positions. With the receipt of additional documentation and upon request, Dr. Berman issued an 6-page addendum to his original report maintaining that the plaintiff was capable of sedentary work activity. Upon request for clarification of his determination that the plaintiff was not impaired but required the opportunity to change positions, Dr. Berman issued a second addendum confirming that the plaintiff was capable of performing the requirements of sedentary work activity.

The plaintiff argues that Dr. Berman did not consider her spondylolisthesis. However, as pointed out by the defendant, Dr. Berman references this condition multiple times throughout his report. Even considering her spondylolisthesis, however, Dr. Berman found that the objective evidence of record, including his own findings upon examination, demonstrated that the plaintiff was capable of performing sedentary work activity.

Dr. White also determined that the plaintiff was capable of performing work activity. The plaintiff argues that Dr. White also failed to consider her spondylolisthesis. In rendering her opinion, Dr. White noted that she considered all of the medical evidence of record to that point, as well as the plaintiff's own reports of limitations. She noted that there were inconsistencies within the reports of certain treating physicians, as well as among the opinions of different physicians. Irrespective of this, based on the plaintiff's subjective complaints and the objective medical test results contained in the record, Dr. White opined that the plaintiff had partial functional impairment. Dr. White opined however that the plaintiff was not so functionally impaired as to be prevented from engaging in any work activity.

While not dispositive as to whether the plaintiff was totally disabled under the plan, Reliance also considered the decisions rendered in the plaintiff's two failed attempts to obtain Social Security disability benefits. In

37

both cases, the different ALJs determined that based upon the objective medical evidence of record, which did not support the plaintiff's subjective complaints of limitations, the plaintiff was capable of performing at least sedentary work activity.

Considering all of the above, neither the plaintiff's subjective complaints nor the findings of her treating physicians, support her claim of total disability from any occupation. Moreover, it cannot be said that the decision of Reliance to terminate the plaintiff's disability benefits was not supported by substantial evidence.

Finally, the plaintiff argues that had Dr. Berman and Dr. White acknowledged the seriousness of her spondylolisthesis, she would have automatically been entitled to continued benefits under the plan as a diagnosis of spondylolisthesis of grade 2 or higher is not subject to the 24-month limitation period. As to this argument, the policy provides under the heading of "Limitations - Other Limited Benefits"[7]:

> 2.   Monthly Benefits will be limited to a total of 24 months in the Insured's lifetime for all Total Disabilities caused by or contributed to [by] musculoskeletal and connective tissue disorders of the neck and back, including any disease, disorder, sprain and strain of the joints and adjacent muscles of the cervical, thoracic and lumbosacral regions and their surrounding soft tissue.
> * * *

---

[7]This is separate and distinct from the mental and nervous disorders limitation provision.

**Total Disabilities caused by the following musculoskeletal and connective tissue disorders will be treated the same as any other Total Disability and the 24 month maximum benefit period will not apply:**

* * *

•      Spondylolisthesis, Grade II or higher . . .

Plaintiff is correct that the 24 month limitation provision in the above section  would not apply to her. The defendant is also correct that the plaintiff appears to conflate this section with the mental or nervous disorders limitation in a separate section of the policy. In the end, this provision requires the defendant to treat Spondylolisthesis, Grade II or higher like any other total disability which they have done. While the plaintiff has been diagnosed with spondylolisthesis, the records indicate that she is not presently totally disabled as a result of this condition, which is the dispositive factor.

The "arbitrary and capricious" standard of review is a deferential standard that is difficult to overcome. Considering the medical evidence available to Reliance in making its benefits determination, the court cannot conclude that the decision to terminate benefits was "without reason, unsupported by substantial evidence or erroneous as a matter of law. <u>Miller</u>, 632 F.3d at 845 (quotation marks omitted). As such, the court finds that the defendant is entitled to summary judgment as a matter of law. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date:  March 30, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-0093-01.wpd